**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FRANCIS M. PASQUALE JR. and DIANE PASQUALE, | No. 23-cv-02752 (MEF)(CF) |
| *Plaintiffs*, | **OPINION and ORDER** |
| v. | |
| BOROUGH OF MOUNTAINSIDE et al., | |
| *Defendants*. | |

**TABLE OF CONTENTS**

I.   **Background**
    A.   **The Allegations**
    B.   **Procedural History**
    C.   **The Motion**
II.  **2017 to 2024**
    A.   **The Individual Defendants**
        1.   **The Police Chief**
        2.   **The Police Officers**
        3.   **The Mayor**
    B.   **The Borough**
III. **The March 20 Incident**
    A.   **The Police Officers**
    B.   **The Mayor**
    C.   **The Borough**
IV.  **Conclusion**

\*   \*   \*

A former police officer and his wife were subjected to what they saw as disproportionate attention from local police, and came to believe this was retaliation, mainly for assistance the former police officer had given to certain investigations.

The couple sued, arguing that this violated the First Amendment and also New Jersey constitutional law.

The various defendants have now moved to dismiss.

The motions are granted in part and denied in part.

                    *   *   *

**I.   Background**

    **A.   The Allegations**

The relevant allegations[1] for now are as follows.

In early 2017, at a borough[2] government meeting, the lawyer for a former local police officer[3] tried to raise concerns about alleged police misconduct.  See Third Amended Complaint and Jury Demand ("Complaint") (ECF 57) ¶ 13.

The mayor[4] stopped the lawyer from speaking.  See id. ¶¶ 14, 16.

Over the following years, through late 2021, the former local police officer (a) was a witness in three lawsuits that named the borough, see id. ¶¶ 17-18, 25, and (b) filed various complaints against borough officials and others.  See id. ¶¶ 20-24.

Roughly while this was going on, the former local police officer and his wife[5] were the focus of what they took as pointed, persistent, and improper attention from local police.  See id. ¶ 27.

---

[1]  Because this is a motion to dismiss, the Court must treat all of the allegations as true.  See McTernan v. City of York, 577 F.3d 521, 526 (3d Cir. 2009).  Whether they are in fact true --- that is a question for later in the case.

[2]  Borough of Mountainside.

[3]  Francis M. Pasquale, Jr.

[4]  Paul Mirabelli.

[5]  Diane Pasquale.

They focused on 36 particular incidents. See id. ¶¶ 27-28. The first two are illustrative:

> a. Apr. 13, 2022 at approximately 8:26 p.m., [borough] [p]olice vehicle shined vehicle mounted spotlight into [the former officer and his wife's] home.
>
> b. Apr. 15, 2022 at approximately 9:33 p.m., [borough] [p]olice vehicle shined vehicle mounted spotlight into [the] home.

Id. ¶ 27(a)-(b).

In addition to these, the former police officer and his wife encountered the borough mayor in public during the evening of March of 2022. See id. ¶ 30. The mayor called the police --- claiming he was being threatened. See id.

Two police officers[6] responded to the call. See id. ¶ 31. They stopped the former police officer and his wife. See id.

### B.  **Procedural History**

In light of the above, the former police officer[7] and his wife[8] filed this lawsuit.

From here, they are called "the Plaintiffs."

The Plaintiffs sued the mayor of the borough[9] and the borough,[10] plus the police officers who arrived on scene on March 20[11] and the chief of the borough police department they worked for.[12]

From here, they are called, collectively, "the Defendants."

\*   \*   \*

The Plaintiffs' basic contention has two steps to it.

---

[6]  Timothy Stasyshyn and Alexandra Harris.

[7]  Recall: Francis M. Pasquale, Jr.

[8]  Recall: Diane Pasquale.

[9]  Recall: Paul Mirabelli.

[10]  Recall: Borough of Mountainside.

[11]  Recall: Timothy Stasyshyn and Alexandra Harris.

[12]  Joseph Giannuzzi.

3

First, the former police officer engaged in First Amendment-protected activity.  See id. ¶ 37.  When his lawyer tried to speak at the borough meeting.  See id. ¶ 13.  And when he filed complaints, see id. ¶¶ 20-24, and served as a witness in cases that concerned the actions of various government officials.  See id. ¶¶ 17-18, 25.

And second, because of all this, the Plaintiffs were retaliated against.  By being subjected to disruptive attention from local police.  See id. ¶¶ 27-28.  And by being stopped during the evening of March 20, 2022.  See id. ¶ 31.

Per the Plaintiffs, the alleged retaliation violated the First Amendment to the United States Constitution.  See id. ¶ 46.  And it also violated the analogous part of the New Jersey Constitution.  See id. ¶ 37-38.

### C. The Motion

The Defendants have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).

Their motions are now before the Court.[13]

## II. 2017 to 2024

As to their federal First Amendment retaliation claim, the Plaintiffs first spotlight the attention that local officials allegedly put on them from 2017 to 2024.  See id. ¶¶ 27-28.  Mainly police driving down their block, it is alleged, and shining lights through their windows.  See id.

But to the extent the First Amendment retaliation claim is based on these allegations, it does not work and must therefore be dismissed.[14]

---

[13] On a Rule 12(b)(6) motion, the Court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]."  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008).

[14] In this part, Part II, the Court focuses only on the overall "campaign," Complaint ¶ 39, allegedly directed at the Plaintiffs from 2017 to 2024.  One particular alleged incident, the one from March 20, see id. ¶¶ 30-33, raises distinct issues and is discussed in Part III.

The referenced claim is pressed against four individual Defendants --- the borough police chief; two borough police officers; and the borough's mayor.  See id. ¶¶ 5-8.

But there are no allegations that these people were involved in the just-referenced activities.  See Part II.A.

And the claim is also pressed against the borough itself.

But there are no allegations the borough was responsible for any of the allegedly improper police attention.  See Part II.B.[15]

### A.    The Individual Defendants

The Plaintiffs' First Amendment retaliation claim is brought under 42 U.S.C. § 1983.  See Complaint ¶¶ 45-46.

That cause of action carries with it certain limits on who can be sued and in what circumstances.

As relevant here, a Section 1983 claim requires "a plaintiff [to] demonstrate a defendant's personal involvement in the alleged wrongs."  Chavarriaga v. N.J. Dep't of Corrs., 806 F.3d 210, 222 (3d Cir. 2015) (cleaned up).[16]

How to satisfy the "personal involvement" test?

Generally, in one of two ways.  First, "by describing the defendant's participation in . . . the wrongful conduct."  Id.  Or second, "by describing the defendant's . . . actual knowledge of and acquiescence in the wrongful conduct."  Id.[17]

---

[15]   There may potentially be other shortfalls in the Plaintiffs' claims.  But there is no need to consider that possibility here, because the Court is dismissing the claims anyway.

[16]   Accord, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) (noting that a Section 1983 "plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); see also Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir. 2020); Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Dodds v. Richardson, 614 F.3d 1185, 1195 (10th Cir. 2010).

[17]   As to the knowledge prong: "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive."  Chavarriaga, 806 F.3d at 222.

5

But here, neither of these boxes is checked.

### 1. **The Police Chief**

Take the police-chief-Defendant first.

The 2017 to 2024 allegations emphasize that police and fire vehicles repeatedly went to the Plaintiffs' house, often late at night.  See Complaint ¶ 27.  Lights, it is alleged, were often shine into the Plaintiffs' house by the passing vehicles, see, e.g., id. ¶ 27(a)-(h), and sometimes the vehicles allegedly honked their horns or flipped on their sirens.  See id. ¶ 27(s), (w).

And the Plaintiffs also allege that, during this period, they encountered borough police officers in unusual contexts.  At their son's graduation, see id. ¶ 27(k), for example, and while out walking in the neighborhood.  See id. ¶ 27(v), (gg).  The former police officer's wife unexpectedly saw police while at work.  See id. ¶ 27(o).

But there are no allegations that the police chief "participat[ed]," Chavarriaga, 806 F.3d at 222, in any of this.

That he drove a car or pointed a light or went to the Plaintiffs' house.  Or that he saw or spoke to the Plaintiffs.

And there are also no police-chief-focused allegations of "actual knowledge of and acquiescence in the wrongful conduct." Id.

No allegations, say, that the police chief directed the alleged actions.  Or that he was told that officers were driving by the Plaintiffs' house, or that he got contemporaneous complaints on that subject.

Bottom line: the Plaintiffs have not alleged "personal involvement," id., on the part of the police chief as to the events of 2017 to 2024 that are said to be retaliatory.  Therefore, their First Amendment retaliation claim cannot go forward.

This conclusion is backed up by the Third Circuit's decision in Baker v. Monroe Township, 50 F.3d 1186 (3d Cir. 1995).

There, police officers searching an apartment pointed guns at various people and handcuffed them.  See id. at 1188-89.

Based on this, an on-scene police supervisor was sued. See id. at 1189, 1193. As here, there was a federal constitutional claim, brought under a Section 1983 cause of action. See id. at 1189.

That meant the claim against the police supervisor could work only if the "personal involvement" bar was cleared. Was it?

The Baker case was on summary judgment, so the plaintiffs were entitled to have the evidence taken in their favor. See id. at 1189–90.

And against that backdrop, the court of appeals held that there was enough evidence to get to a jury against the on-scene supervisor.

The supervisor did not personally participate in the guns-and-handcuffs actions of his police department colleagues. See id. at 1192–93.

And he did not see what others were up to, see id. at 1193, so the "knowledge" test could not be met that way.

But he spoke directly to police under his command while they kept people handcuffed, "hollering instructions" at the officers while the relevant events were unfolding. See id. at 1193–94 (cleaned up). And during that period, all of the relevant people, including the supervisor, were together in a "small apartment," id. at 1193, with an open door between where the supervisor was and where at least some of the handcuffed people were. See id. at 1193–94.

What this adds up to: under Baker, (a) very close physical proximity to the underlying events, plus (b) direct interaction with supervisees during the relevant events --- these can sometimes be enough to establish the sort of "personal involvement," Chavarriaga, 806 F.3d at 222, by a supervisor that can make him liable under Section 1983 for a supervisee's actions.

But there is nothing like that here, as to either (a) or (b).

No allegations that the police chief was on the scene while patrols were allegedly going on near the Plaintiffs' house. And

7

no allegations that the chief spoke with police officers during the patrols --- for example, over the radio.[18]

And note the other piece of the Third Circuit's Baker decision.

Police had also searched the purse of a woman who was detained outside of the "small apartment."  See Baker, 50 F.3d at 1189, 1193.  But the court of appeals held that the supervisor, Armstrong, could not be responsible for that search under Section 1983.

> [T]he search of Mrs. Baker's pocketbook occurred outside, while Armstrong was inside securing the apartment.  We do not believe Armstrong can be held accountable for this search, for the evidence does not support the inference that Armstrong knew what was happening outside the apartment.

Id. at 1195.

The police chief here is not alleged to have been anywhere near the underlying events while they are said to have taken place.

And even if he had been --- under Baker's purse-search holding, that would not have been enough, alone, to support Section 1983 "personal involvement," Chavarriaga, 806 F.3d at 222, liability as to the police chief for the 2017 to 2024 events.

Note, too, that Baker is no outlier.

The court of appeals has routinely held that knowledge enough to clear the "personal involvement" bar cannot be established solely by a supervisor's on-scene presence.  See, e.g., Santiago v. Warminster Twp., 629 F.3d 121, 134 (3d Cir. 2010); McKenna v. City of Philadelphia, 582 F.3d 447, 460 (3d Cir. 2009).

And there is less than that alleged here.

If anything, this case is analogous to Evancho v. Fisher, 423 F.3d 347 (3d Cir. 2005).  Evancho, a state employee, sued the Pennsylvania Attorney General --- alleging a retaliatory transfer.  See id. at 349-50.  The court of appeals concluded that the case could not go forward, see id. at 355, because the complaint "d[id] not contain even a remote suggestion [the

---

[18]  Or even that information was relayed to him through others --- from more mid-level supervisors, like captains or lieutenants.

8

Attorney General] had contemporaneous, personal knowledge of [Evancho's] transfer and acquiesced in it." Id. at 353.

So too here.

To the extent it rests on the alleged 2017 to 2024 events, the First Amendment retaliation claim against the police chief must be dismissed.

### 2.   The Police Officers

Same conclusion as to the two police officers who were named as Defendants in connection with the 2017 to 2024 events.

There is zero suggestion that they might have been involved in the underlying alleged conduct or been aware of it in any way. They have no alleged connection to what is said to have happened.

### 3.   The Mayor

Same result for the mayor. There are, again, no allegations of "personal involvement." Chavarriaga, 806 F.3d at 222.

\*   \*   \*

As to the alleged events of 2017 to 2024,[19] there are no meaningful allegations as to any individual Defendant's personal involvement, let alone allegations that even begin to plausibly move the needle.[20]

To the extent it rests on the just-referenced events the First Amendment claim must be dismissed.[21]

---

[19] As to what is not encompassed within the Court's analysis for now, see footnote 14.

[20] See Fed. R. Civ. P. 11(b)(2).

[21] Three things. First, the Plaintiffs also allege that their free speech rights under the New Jersey Constitution were violated by the alleged events of 2017 to 2024. See Complaint ¶¶ 34–43. For that claim, the cause of action is supplied not by Section 1983 (which covers only alleged underlying violations of federal law), but the New Jersey Civil Rights Act ("NJCRA"), see Complaint ¶¶ 35–36, whose cause of action covers alleged underlying violations of state law. See N.J. Stat. Ann. § 10:6-2(c). But roughly the same personal involvement is needed under both statutes. See Baklayan v. Ortiz, 2012 WL 1150842, at \*6

B. **The Borough**

Next, the Plaintiffs argue that the borough is liable for the alleged events of 2017 to 2024. See Complaint ¶ 51.

Recall that these events (shining lights from passing police cars, for example, see id. ¶ 27) are said to have amounted to retaliation in violation of the First Amendment, see id. ¶ 46, and are pressed under Section 1983. See id. ¶¶ 45-46.

Under Section 1983, a municipality can be liable in only limited circumstances.

The Plaintiffs contend that they "seek[] redress . . . for only those acts which the municipality has officially sanctioned or ordered through the acts of those officials who have final policy/decision-making authority." Plaintiffs' Memorandum of

---

(D.N.J. Apr. 5, 2012) ("Both the NJCRA and § 1983 premise liability on personal involvement in the alleged misconduct . . . . . ."); see also Didiano v. Balicki, 2011 WL 1466131, at *10 (D.N.J. Apr. 18, 2011); Gilmore v. Reilly, 2010 WL 1462876, at *6 (D.N.J. Apr. 9, 2010); Covington v. Twp. of Hillside, 2021 WL 4272880, at *5 (D.N.J. Sep. 20, 2021); Glaesener v. City of Jersey City, 2021 WL 4206297, at *3 (D.N.J. Sep. 15, 2021). So as to the individual Defendants, the state constitution/NJCRA claim fails for the same reason and to the same extent as the federal constitution/Section 1983 claim. A second point. The third count of the complaint, see Complaint ¶¶ 52-61, presses federal and state constitutional claims against one individual Defendant (the mayor) based on a particular alleged incident (from August 12, 2024) during which a fire truck light was shone into the Plaintiffs' house. See id. ¶ 61. But same problem as has been discussed. There are no suggestions of personal involvement. Third and finally, note that each of the individual Defendants have been sued in both their personal and official capacities. See id. ¶¶ 5-6, 8. A "lawsuit against public officers in their official capacities is functionally a suit against the public entity that employs them." Cuvo v. De Biasi, 169 F. App'x 688, 693 (3d Cir. 2006) (citing McMillan v. Monroe Cnty., 520 U.S. 781 (1997)). Because the Plaintiffs have sued "the public entity that employs them," the borough, the official-capacity claims against the individual Defendants are "redundant" and must be dismissed. See id. (citing McMillan, 520 U.S. at 781; Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)).

Law Opposing Defendants' Motions for Dismissal ("Plaintiffs' Opposition") (ECF 60) at 9-10.

The argument seems to be that the mayor and the police chief (who, per the Plaintiffs, had "final policy/decision-making authority") approved the 2017 to 2024 events after the fact ("sanctioned") or directed them in advance ("ordered"). See id. at 10.

*   *   *

As a general matter, liability theories like this can work.

A municipality can be liable when, after the fact, a person with appropriate authority "ratif[ies] the [unconstitutional] conduct . . . after it has occurred." Hill v. Borough of Kutztown, 455 F.3d 225, 245 (3d Cir. 2006).

But a policymaker cannot "ratify" conduct he did not know about. See Christie v. Iopa, 176 F.3d 1231, 1239 (9th Cir. 1999) (holding that a county could not be liable for a retaliatory prosecution based on a senior prosecutor's "ratification" because the plaintiff "provided no evidence" the prosecutor had "knowledge of the alleged constitutional violation"); Bryson v. City of Oklahoma City, 627 F.3d 784, 790 (10th Cir. 2010) (holding that a city could not be held liable for faulty forensic testing based on decisionmaker-"ratification" because no decisionmakers "were even aware of [the chemist's] unconstitutional actions with respect to [the p]laintiff"); Montero v. City of Yonkers, 890 F.3d 386, 403-04 (2d Cir. 2018) (holding that a city could not be liable for alleged First Amendment retaliation against a police officer based on a police commissioner's "ratif[ication]" because the plaintiff "fail[ed] to allege . . . that the [police commissioner] had or should have had any knowledge of the[] retaliatory actions"); Thompson v. Sheriff, 542 F. App'x 826, 830 (11th Cir. 2013) (holding that a county could not be held liable for an officer's excessive force based on a sheriff's "ratification" because the "[s]heriff was not even aware of allegations of wrongdoing").

And as set out above, see Part II.A.1 and Part II.A.3, there are no allegations here that the police chief or the mayor (the "policymakers" invoked by the Plaintiffs, see Plaintiffs'

11

Opposition at 10) knew about the alleged events of 2017 to 2024.[22]  So they could not have ratified them.

Lack of alleged knowledge also undermines the Plaintiffs' other argument for why the borough is liable.

The mayor and the police chief could not have ratified on the back-end, after the fact, conduct that there are no allegations they knew about.  And by the same logic they could not have directed, on the front-end, conduct that there are no allegations they knew about.

The Plaintiffs' First Amendment retaliation claim against the borough must be dismissed to the extent it rests on the 2017 to 2024 allegations.[23]

---

[22]  And note: there is no claim in the complaint that mayor/police chief knowledge can be inferred --- say, because the alleged events of 2017 to 2024 were simply too large and/or too publicly visible for borough leaders to miss.  And a claim along those lines might be hard to make stick.  Allegations of extra police patrols and vexing light shining --- the profile of such activities is not obviously outsized, such that it can be easily inferred that information about them percolated up to the mayor and police chief.

[23]  Two things.  First, there are stray references to the borough being liable because its officers were acting under a kind of official local policy or custom.  See Complaint ¶¶ 5-6, 38, 61; Plaintiffs' Opposition at 8-10.  But that is too sparse.  "To satisfy the pleading standard, [a plaintiff] must identify a custom or policy, and specify what exactly that custom or policy was." McTernan, 564 F.3d at 658.  Second, the Plaintiffs also claim that the borough is liable for violating speech-protective parts of the New Jersey Constitution.  See Complaint ¶¶ 34-43. That state-law claim is advanced based on the NJCRA.  See id. ¶¶ 35-36.  But per the New Jersey Supreme Court, the NJCRA imports roughly the same limits on municipal liability as Section 1983, see Winberry Realty P'ship v. Borough of Rutherford, 247 N.J. 165, 190 (2021), the cause of action under which the federal First Amendment claim was brought against the borough.  So the state constitutional claim against the borough must be dismissed for the same reason as the federal constitutional claim.

12

### III. **The March 20 Incident**

The Plaintiffs also press a second argument: that in retaliation for the former-police-officer-Plaintiff's actions (described in Part I.A), the Plaintiffs were stopped on March 20, 2022.

The allegations as to March 20:

> [O]n March 20, 2022, [the] Plaintiffs were walking in their neighborhood when [the mayor] approached [the] Plaintiffs and cursed at them. [The mayor] called the police after the encounter and falsely claimed not to know who he encountered and also falsely stated that a man and "his wife" threatened him.
>
> In response, between approximately 8:00 p.m. and 9:00 p.m., [two police officers] followed [the] Plaintiffs as they walked on Bridle Path, Constitution Plaza, Birch Hill Rd., and Hickory Ln., stopping [the] Plaintiffs numerous times along the way. In fact, [one officer] detained [the] Plaintiffs three times before [the other officer] even approached.
>
> Afterward, when [the police-officer-Defendants] reported back to [the mayor-Defendant], [the mayor] admits that he knew who the man and "his wife" were all along, exclaiming, "Pasquale. Cocksucker. Asshole," before [the police officers] quickly reminded the [m]ayor that he is being audio and video recorded.
>
> Defendants then edited and destroyed body cam footage of the encounters.

Complaint ¶¶ 30-33.

The Plaintiffs contend that the above amounts to First Amendment retaliation, for which the two responding police officers[24] can be liable, plus the mayor[25] and the borough. See Complaint ¶ 49.[26]

---

[24] Recall: Timothy Stasyshyn and Alexandra Harris.

[25] Recall: Paul Mirabelli.

[26] The police chief is also named as a Defendant in connection with the alleged March 20 events. See Complaint ¶ 7. But there is no suggestion he had anything to do with those events. And so the Plaintiffs' federal and state claims as to the police

13

A.  **The Police Officers**

As to the two police officers who responded on March 20, the Plaintiffs' claim is that they engaged in First Amendment retaliation.  See id. ¶ 46.[27]

The police-officer-Defendants move to dismiss that claim on various grounds, including that no claim has been stated.  See Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint Pursuant to Rule 12(b)(6) ("Defendants' Brief") (ECF 58-2) at 10-15.

Working through such an argument requires, first, a recitation of the elements of the claim.  See Connelly v. Lane Constr. Corp., 809 F.3d 780, 787 (3d Cir. 2016).

For a First Amendment retaliation claim, these are: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action."  Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006); see also Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

But there is nothing in the Plaintiffs' complaint as to the third element, the causal one.

As to a given defendant, the law is clear: there can be a causal link between constitutionally protected conduct (element one) and retaliatory action (element two) only if the defendant is "aware of the protected conduct."  Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002).

Here, that principle cuts off the Plaintiffs' claim.

The police-officer-Defendants could have acted against the Plaintiffs (by stopping them; element two) because of the former-police-officer-Plaintiff's assertedly protected

---

chief must be dismissed to the extent they rest on allegations as to the events of March 20, largely for the no-personal-involvement reasons covered in Part II.A.1.

[27]  There is no claim that the officers, or anyone else, violated the Fourth Amendment.

14

activities (described in Part I.A; element one) only if the officers knew about those activities.

But there is no allegation of knowledge here.

No suggestion, for example, that the police-officer-Defendants were aware of what had transpired around five years before at a borough meeting, see Complaint ¶¶ 13-16, or of the former-police-officer-Plaintiff's complaints against borough officials and others. See id. ¶¶ 20-24.[28]

Accordingly, the Plaintiffs' First Amendment retaliation claim against the police-officer-Defendants cannot go forward to the extent it is based on the March 20 allegations. See, e.g., Ambrose, 303 F.3d at 493; Palfrey v. Jefferson-Morgan Sch. Dist., 355 F. App'x 590, 593-94 (3d Cir. 2009); Boxill v. O'Grady, 935 F.3d 510, 518-19 (6th Cir. 2019); Cabrol v. Town of Youngsville, 106 F.3d 101, 108 (5th Cir. 1997); Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995).[29]

### B. The Mayor

As to the mayor, he argues, among other things, that he is entitled to qualified immunity as to the March 20-related allegations. See Brief in Support of Defendant Paul Mirabelli's Motion to Dismiss with Prejudice Plaintiffs' Third Amended

---

[28] If anything, the complaint seems to rest on allegations that the police officers were affirmatively told that the mayor did "not . . . know" who had "encountered" him. Complaint ¶ 30. The mayor's alleged obscuring of the Plaintiffs' identities is 180 degrees away from the police-officer-Defendants knowing who the Plaintiffs were --- and also what one of them had previously done that was assertedly First Amendment protected.

[29] The claim under the relevant provisions of the New Jersey Constitution, see Complaint ¶¶ 34-43, fails for the same reason and to the same extent as the federal constitutional claim. Per the New Jersey Supreme Court, the New Jersey Constitution's "free speech clause is generally interpreted as co-extensive with the First Amendment." Kratovil v. City of New Brunswick, 261 N.J. 1, 16 (2025) (cleaned up). And so the lack of plausible causation allegations, which prevent the federal constitutional claim from getting off the ground, also cut off the state constitutional claim.

15

Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Mayor's Brief") (ECF 59-1) at 20-21.

Once a defendant has raised qualified immunity, it is over to the plaintiff --- who then "has to come forward and show what the clearly established law actually is." Courney v. City of Englewood, 2025 WL 2170694, at *4 (D.N.J. July 30, 2025) (cleaned up). If a plaintiff does not produce "sufficiently on-point indications that the relevant law is clearly established, then the defendant gets qualified immunity." Id. (cleaned up).

The Plaintiffs do not try to do any of this.

They cite foundational Supreme Court cases that explain, in general, what qualified immunity is. See Plaintiffs' Opposition at 8 (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987); White v. Pauly, 580 U.S. 73, 78-79 (2017))). And a Third Circuit decision discussing the roles of the judge and the jury in the qualified immunity context. See id. (citing Monteiro v. City of Elizabeth, 436 F.3d 397, 405 (3d Cir. 2006)).

But the Plaintiffs cite no cases that that purport to speak to the alleged situation in this case --- to explain why, here, there is no qualified immunity for the mayor.

The burden shifted to the Plaintiffs, see Courney, 2025 WL 2170694, at *4 n.15, and they did not meaningfully try to carry it.

To be sure, "no one needs to come forward with any authority when the alleged violation of law is entirely obvious; in that situation, finding sufficiently on-point 'clearly established' case law is unnecessary for either the plaintiff or the defendant." Id. (citing Hope v. Pelzer, 536 U.S. 730, 734-35, 741-42 (2002); Taylor v. Riojas, 592 U.S. 7, 8-9 (2020)); see also Schneyder v. Smith, 653 F.3d 313, 330 (3d Cir. 2011) ("In extraordinary cases, a broad principle of law can clearly establish the rules governing a new set of circumstances if the wrongfulness of an official's action is so obvious that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.") (cleaned up).

The Plaintiffs seem to be pressing something of an argument along those lines. See Plaintiffs' Opposition at 8.

16

But they do not meaningfully develop it.  Their argument is a couple of sentences long and does not cite any cases.  See id.

Does this mean the Defendants should prevail?  That may depend to an extent on whether the burden shifts to the plaintiff in a Schneyder "extraordinary circumstances" situation just as it does in a "clearly established law" situation.

The parties, though, do not take this burden-shift issue on.

And other qualified immunity issues are not meaningfully addressed, either.

For example, a number of cases seem to suggest that there is no clearly established right to be free from an investigation initiated in retaliation for First Amendment-protected conduct.  See Sivella v. Twp. of Lyndhurst, 2021 WL 3356934, at *3 (3d Cir. Aug. 3, 2021); Lincoln v. Maketa, 880 F.3d 533, 540-41 (10th Cir. 2018); Moore v. Garnand, 83 F.4th 743, 752-53 (9th Cir. 2023); cf. Hartman v. Moore, 547 U.S. 250, 262 n.9 (2006).

Is that what the mayor is essentially alleged to have done on March 20 when he summoned police to the scene based on allegedly "false[]," Complaint ¶ 30, information?  Was he simply touching off an investigation?

Or is what the mayor did more appropriately analogized to all-but directing police to make a stop (or perhaps an arrest) that he (the mayor) knew was "false" --- and, therefore, a stop or arrest that the mayor knew was not based on probable cause?  Cf. Blackwell v. Nocerini, 123 F.4th 479, 489 (6th Cir. 2024); Nieters v. Holtan, 83 F.4th 1099, 1110 (8th Cir. 2023); Thurairajah v. City of Fort Smith, 925 F.3d 979, 984-85 (8th Cir. 2019).

The Court can take these questions on.

But the wiser course is to allow the parties to weigh in as fully as they might potentially wish to --- as to qualified immunity for the mayor in connection with the March 20 alleged events, and as to any other aspects of the March 20 allegations as they relate to the mayor that they might wish to address.

An order as to a briefing schedule will issue today.

17

**C.   The Borough**

As to March 20, the Plaintiffs indicated that they sought "redress against the [borough] for only the acts of those officials who have final policy/decision-making authority." Plaintiffs' Opposition at 9–10.

And the borough then responded by arguing that the Plaintiffs' March 20 allegations "fail to set forth a deprivation of any state or federal constitutional right." Reply Brief in Further Support of Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint Pursuant to Rule 12(b)(6) ("Reply Brief") (ECF 62) at 2.

Why not?  Per the borough, mainly because the Plaintiffs have not plausibly alleged that the March 20 incident "was a seizure within the meaning of the [Fourth] Amendment." Id. at 3.

But the Plaintiffs' claim is not under the Fourth Amendment. (That sort of claim would require a seizure.)

Rather, the Plaintiffs' claim is a First Amendment retaliation claim.

And there is little doubt that alleged First Amendment retaliation that does not rise to the level of a seizure can be enough. See Mirabella v. Villard, 853 F.3d 641, 650 (3d Cir. 2017) (e-mail prohibiting plaintiffs from "contacting town officials and employees for any reason"); Noonan v. Kane, 698 F. App'x 49, 54 (3d Cir. 2017) ("threats of adverse action or punishment").

Moreover, it is hard to know why the alleged police "stop[]" and "det[ention]" here, Complaint ¶ 31, does not amount to at least a so-called Terry stop --- and such a stop counts as a Fourth Amendment seizure. See Terry v. Ohio, 392 U.S. 1, 19 (1968); United States v. Brown, 765 F.3d 278, 289 (3d Cir. 2014).[30]

---

[30] The borough suggests that no First Amendment retaliation claim can be made out here for some added reasons, too. See Reply Brief at 2-3.  But the relevant argument is not developed enough.  If the argument is that there can generally be no First Amendment retaliation claim based on an arrest if the plaintiff fails to prove that the arrest was not supported by probable cause, see Nieves v. Bartlett, 587 U.S. 391, 402 (2019) --- then such an argument cannot be evaluated at this point, before

**IV.  Conclusion**

To the extent the Plaintiffs' claims are based on the alleged events of 2017 to 2024, minus the events of March 20, 2022 --- those claims are dismissed, against each of the individual Defendants and against the borough.  See Part II.

---

discovery into the events of March 20 allows the proof to emerge.  If the argument is a causation argument --- that too much time elapsed between the Plaintiffs' assertedly First-Amendment-protected activities and the events of March 20 --- that, too, must wait for some discovery.  The mayor's allegedly expressed animus just after the events of March 20, see Complaint ¶ 32, may be as read as surprise as to the identity of the people who he and his wife had "encountered" that night --- the mayor did not know they were, called the police for assistance, and realized after the fact that the people were in fact known to him, they were the Plaintiffs.  This interpretation would be harder to square with a retaliation claim --- it tends to suggest that the mayor did not have the Plaintiffs in mind, that too much time may indeed have elapsed.  (And this interpretation of events may possibly tend to suggest that any stop here was supported by reasonable suspicion and any arrest by probable cause.)  But there is another possible interpretation of the allegations, too.  Namely, that the mayor expressed animus after the fact not because he was surprised, but because it was simply his first chance to do so, to criticize the Plaintiffs to police on the scene and to explain why he had "falsely" summoned the officers.  On that interpretation of the complaint, the Plaintiffs were allegedly top of mind for the mayor --- and that cuts against an argument that the former-police-officer-Plaintiff's assertedly First-Amendment-protected activities were so far in the rearview mirror by March 20, 2022 that the mayor could not have been thinking of them that evening.  Which of these competing interpretations is the better one?  That is not a question for this stage of the case.  The Plaintiffs, for now, are entitled to the inference that is more favorable to them, see, e.g., Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011), and here that is the latter inference/interpretation.  And on that approach, there can be no suggestion in this case that it simply implausible that there is causation.

19

the extent they rest on the events of March 20.  See footnote 27 and Part III.A.

The narrow March 20-focused claims can go forward for now as to the borough.  See Part III.C.  And as to the mayor, see Part III.B, what is left of the motion to dismiss (as to the March 20-focused claim) is administratively terminated, so that the parties can file additional motion papers, should they wish to.

\* \* \*

IT IS on this 30th day of October, 2025, **SO ORDERED.**

_____
Michael E. Farbiarz, U.S.D.J.